NIMMONS, Judge.
The heavy volume of sentence appeals, which began with the advent of sentencing guidelines, continues unabated.[1] This is another such appeal.
The appellants in these consolidated appeals [2] complain of the trial court’s upward *952 departure from the sentences provided for in the sentencing guidelines scoresheet. We affirm.
Both appellants, husband and wife, pled nolo contendere to two counts (one as to each of their two children) of aggravated child abuse. The first count charged that the appellants
... on or about an unknown date, between the dates of 1 September, 1982 and 1 August, 1985, inclusive and continuing did unlawfully commit aggravated child abuse upon Michael Hall, a child under 18 years of age, by maliciously punishing and/or willfully torturing the child, including beatings and burnings, contrary to Section 827.03, Florida Statutes.
The second count charged in identical language aggravated child abuse as to the daughter, Regina Hall. A third count, similar to the first two, dealing with a third child was nolle prossed after the entry of appellants’ nolo pleas.
As to each defendant, the sentencing guidelines called for a total sentence range of 4⅛⅛ to 5V2 years. Instead, as to each defendant, the trial court imposed a sentence of 15 years on the first count and a 5 year consecutive sentence on the second count followed by a 10 year probationary term. The trial court entered an order stating as reasons for departure: (1) emotional trauma, fear and distress suffered by the victims; (2) the offenses were committed against the victims by their natural parents, persons in familial authority; and (3) severe and permanent scarring of the victims’ bodies as a result of defendants’ premeditated, repetitive, and long-lasting beatings of their children.
With respect to the first reason for departure, we have recently held that emotional trauma to a victim of an aggravated child abuse can be a valid reason for departure. Kokx v. State, 498 So.2d 534 (Fla. 1st DCA 1986). And the facts in the instant case overwhelmingly support the finding of emotional trauma as to both victims.
As to the second reason for departure, the fact that the defendants were in familial authority vis-a-vis the victims and thereby occupied a special position of trust has been sustained as a permissible reason for departure. Williams v. State, 462 So.2d 36 (Fla. 1st DCA 1984); Ross v. State, 478 So.2d 480 (Fla. 1st DCA 1985).
We also find the third reason for departure, severe and permanent scarring and disfigurement of the children’s bodies, a clear and convincing reason for departure. Although it is true that points were scored for death or severe injury on the guidelines scoresheet under “Victim Injury (physical),” we do not believe that permanent disfigurement is necessarily encompassed therein. See Ross v. State, supra at 481. The permanent scarring and disfigurement involved in the instant case is, we believe, different from the victim injury contemplated by the scoresheet. The evidence which was before the trial judge, and which we summarize below, should serve to bolster this conclusion.
At the time of the defendants’ arrests, the victims, Regina and Michael, were ages 6 and 4 years, respectively. According to the probable cause affidavit, which was, by stipulation, relied upon as the factual basis for the court’s acceptance of the nolo plea, the defendants started beating their children to potty train them as soon as the children were one year old. They would beat them every time the children would urinate without telling their parents. This would occur four or five times per day and would, according to the defendants, entail five or six beatings with a belt. This practice went on for a period of one year— again according to the defendants.
In the probable cause affidavit, Officer Bruce noted numerous scars over the bodies of both victims. In addition, at or about the time of the arrest of the defendants, both children bore fresh wounds.
Prior to sentencing, the trial judge heard testimony from a physician, Dr. Samuel *953 Moorer, who had examined both victims. Excerpts from his very significant testimony are reproduced as follows:
Q. (Mr. Poitinger continuing) Dr. Moor-er, did you have occasion to examine a Regina Hall and a Michael Hall, sir?
A. Yes. I examined both of them on the 1st of August, 1985.
Q. And what were your findings in those cases?
A. Michael was the younger of the two siblings. He was three, almost four years old. Michael had evidence of chronic multiple beatings with a variety of implements. He had more than one hundred marks on his body, approximately half of which were permanent scars. The largest areas were on both buttocks, where he had two roughly circular thick areas of scar tissue that measured about six centimeters, which is around three inches across. And that occupied at least 50 percent of the area of his buttocks. These two areas of scar tissue were quite thick. They were, on palpating, feeling the area, you could feel the thickness of the scar tissue was at least an inch thick.
* * * * * *
Q. Would you explain to the Court those areas that you are noting on the buttocks?
A. (Witness indicating on photographs.) Well, I’m talking about these two areas here. You can see the size of them. But what you can’t appreciate from the photograph is the feel to them. These white thickened areas, they weren’t just a small area of scar tissue. They were at least an inch thick.
* * * * * *
This amount of scar tissue implies that there’s a chronic open wound that took a considerable amount of time to heal in and to scar in. You might get such a wound from a third-degree bum. You might get such a wound from a second-degree bum that became secondarily infected and you had a lot of tissue loss. There’s a large hole here that had to be filled in with scar tissue. The marks on the body, on the buttocks and back, I counted 50 marks, and stopped counting at 50. Most of these were linear. Some of them were curvilinear, that is loop marks. They were clearly caused by an implement. They’re not the sort of scars you get from — they’re not the kind of scars that kids routinely pick up.
* * * * * *
He is very malnourished. He is almost four years old. He was the normal height for a child about two and a half. But his weight was that normal for a child of only 18 months. So he was both under height but much more undernourished, severely malnourished. He was dirty. He smelled bad. And his behavior was quite abnormal for a child his age. He made no intelligible sounds. His eating behavior was very abnormal. We gave him a can of fruit juice, one of those little eight-ounce cartons of fruit juice, and he literally inhaled it in one breath, which is dramatically abnormal.
Dr. Moorer’s attention was then turned to Regina, Michael’s older sister:
Q. All right, sir. Regarding Regina, Doctor, have you had an occasion to examine Regina?
A. Yes.
Q. And I’ll show you some photographs, if they will assist you in your testimony.
A. Regina similarly had multiple marks. I stopped counting at 50 marks on her body. The majority of them were from half an inch to two inches long. There were a number of smaller, crescent-shaped marks, some of which opposed each other, which are typical fingernail pinch-marks. Most of them were loop marks and strap marks. She had some fresh marks. I examined her again later. She had some fresh marks. But the majority of her scars were old and well-healed. Her behavior was even more abnormal than that of her brother. She was six *954 and a half years old. Her speech was so abnormal that I felt that she might be psychotic, and consulted Dr. Connie Spears about it. I felt that her behavior, particularly as it relates to her speech, were both extraordinarily abnormal for a child of her age. Her size also was very small. She’s six and a half years old. Her height was normal for a three-and-a-half-year-old. She was well below normal range for her age. Her weight was similarly much lower than would be expected, being normal weight for a two-year- and-nine-month-old. So even when you look at her weight based on what it should be for her height, not for her age, she was still grossly malnourished.
Dr. Moorer testified that of the over 200 abused children he had examined, he had “never seen children with as many or as severe scars on their bodies as these kids, including the children I’ve seen that have died.”
Officer Bruce also testified that he had been involved as a law enforcement officer in at least 100 child abuse cases and that this was the most severe case of child abuse he had ever seen.
We have had the unpleasant duty of examining photographs of the two children in this case. However, it is good that we did, for mere words are inadequate to describe the horrible and pervasive scarring that covers the bodies of these poor, unfortunate children.
Our review of this case persuades us that the framers of the sentencing guidelines did not intend, by providing for the scoring of “victim injury,” to preclude upward departure grounded upon scarring and disfigurement.
In Vanover v. State, 498 So.2d 899 (Fla.1986), the Supreme Court found valid the following reason for upward departure in an aggravated battery case:
This was a particularly aggravated set of circumstances which sets this case far and above the average aggravated battery.
Certainly the instant case qualifies for that kind of characterization at least as much as the circumstances did in the Vanover case. True, the trial judge in the present case did not mouth the same verbiage as that quoted above from Vanover — probably because he assumed that such a broad general reason would not be acceptable as a clear and convincing reason. Our point is that if that was an acceptable reason for departure in Vanover, we have no difficulty in equating the judge’s findings and supporting evidence in the instant case with a finding that this was a particularly aggravated set of circumstances which sets this case far and above the average aggravated child abuse case — thus justifying upward departure.
Finally, we cannot help but comment that it seems an extravagant utilization of judicial resources at the appellate level to have to expend such a substantial amount of time and energy in justifying upward departure from a guidelines sentence which under any reasonable standard — indeed to even the casual observer — should be regarded as patently inadequate for the heinous offenses committed against these helpless children. Nevertheless, out of an abundance of caution we certify to the Florida Supreme Court the following question as one of great public importance:
CAN PERMANENT SCARRING AND DISFIGUREMENT OF THE VICTIM IN AN AGGRAVATED CHILD ABUSE CASE BE RELIED UPON FOR UPWARD DEPARTURE WHERE VICTIM INJURY HAS BEEN SCORED TO THE MAXIMUM EXTENT ON THE SENTENCING GUIDELINES SCORE-SHEET?
WENTWORTH and WIGGINTON, JJ., concur.

. As reflected by a review of Florida Law Weekly, for the first two months of 1987, sentencing guidelines opinions — not counting dispositions without opinion such as per curiam affirmanc-es — have constituted 15.2% of the total number of opinions written by the Florida district courts of appeal. For earlier figures, see Williams v. State, 484 So.2d 71, n. 1 (Fla. 1st DCA 1986).

. Appellants were tried together in the lower court.